WILLIAM CANNON, JR., Plaintiff-Appellant, v. STEPHEN MOTE *et al.*, Defendants-Appellees.

Fourth District   No. 4—04—0222

Opinion filed March 8, 2005.—Rehearing denied April 6, 2005.

William Cannon, Jr., of Pontiac, appellant *pro se.*

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Timothy K. McPike, Assistant Attorney General, of counsel), for appellees.

PRESIDING JUSTICE COOK delivered the opinion of the court:

Plaintiff, William Cannon, Jr., a prisoner in the custody of the Illinois Department of Corrections (DOC), filed a *mandamus* complaint against defendants, certain DOC employees, alleging his right to religious freedom was violated when he was disciplined for refusing, on religious grounds, to take a certain tuberculosis (TB) test. Defendants' motion to dismiss under section 2—615 of the Code of Civil Procedure (735 ILCS 5/2—615 (West 2002)) was granted. Plaintiff appeals. We affirm.

## I. BACKGROUND

Plaintiff was ordered by DOC staff to take an annual skin test for TB (PPD test). When plaintiff refused, a discipline report was filed against him for disobeying a direct order. Plaintiff argued at his disciplinary hearing that he objected to the PPD test for religious reasons and offered to take an X-ray examination or sputum test instead. The adjustment committee found him guilty of disobeying a direct order and imposed three months of C-grade status, three months of segregation, and three months' loss of commissary and audio/visual privileges. Plaintiff appealed to the administrative review board (ARB), arguing a requirement that he take the PPD test violated his right to exercise his religion under the first and fourteenth amendments and the Illinois Constitution. The ARB denied his grievance, and the DOC Director concurred in the ARB decision. Plaintiff then filed a *mandamus* complaint in the circuit court, requesting that his disciplinary report be expunged.

In his *mandamus* complaint, plaintiff argued, among numerous other things, that section 7 of the Tuberculosis Sanitarium District Act (Act) (70 ILCS 920/7 (West 2002)) allowed him to refuse a TB examination if he objected to such examination on religious grounds and that plaintiff's rights under the first amendment and fourteenth

amendment of the United States Constitution (U.S. Const., amends. I, XIV) and plaintiff's rights under article I, sections 2 and 3, of the Illinois Constitution (Ill. Const. 1970, art. I, §§ 2, 3) were violated. The circuit court dismissed the petition, finding that DOC had discretion in accomplishing TB testing and plaintiff's rights as an inmate must give way to DOC's decision. Plaintiff filed a motion for reconsideration of the dismissal of his complaint. Despite the fact that a petitioner in civil litigation may not be entitled to the appointment of counsel, the trial judge in this case exercised his discretion and appointed counsel. After the reconsideration hearing in which defendants' motion to dismiss was once again granted, plaintiff appealed.

On appeal, plaintiff alleges his court-appointed counsel for the reconsideration hearing was ineffective for various reasons and the circuit court abused its discretion in dismissing his complaint. Defendants argue plaintiff has no statutory right to refuse to take the PPD test under section 7 of the Act and DOC can discipline plaintiff for refusing to take the PPD test despite his religious objection.

## II. ANALYSIS

■ First, plaintiff seems to allege that his appointed counsel was ineffective for failing to question why defendants were allowed to file their motion to dismiss outside the 60 days within which the circuit judge requested all motions to be filed and for failing to verbally reiterate during the hearing all of the allegations plaintiff made in his *pro se mandamus* petition. For ineffective-assistance-of-counsel claims in criminal cases, the Supreme Court of Illinois adopted the test outlined by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526, 473 N.E.2d 1246, 1255 (1984). Assuming, but not deciding, that *Strickland* even applies to this case, the two prongs under the *Strickland* test are (1) "the defendant must show that counsel's performance was deficient" and (2) "the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. From plaintiff's allegations, it does not appear that plaintiff's counsel's performance was deficient or that such performance prejudiced the plaintiff in any way.

■ Plaintiff next contends that he has a statutory right to refuse to take the PPD test under section 7 (70 ILCS 920/7 (West 2002)). Section 7 is entitled "Free services to residents of district—Consent of afflicted person—Home treatment—Out-of-district patients—Treatment in other institutions." 70 ILCS 920/7 (West 2002). While section 7 does state "[n]o person shall be compelled to undergo an examination

or test for [TB] if he or she objects thereto on the ground that it is contrary to his or her religious convictions," this Act applies only to sanitarium districts. 70 ILCS 920/7 (West 2002). "Any area of contiguous territory lying wholly within one county but entirely outside the corporate limits of any city or village which has adopted [d]ivision 29 of [a]rticle 11 of the 'Illinois Municipal Code', *** *may* be incorporated as a [TB] sanitarium district." (Emphasis added.) 70 ILCS 920/1 (West 2002). The sanitarium district rules apply only to those areas that choose to form such districts. Article 11 of the Illinois Municipal Code allows cities and villages to form similar TB sanitariums (65 ILCS 5/11—29—1 (West 2002)), allows such sanitarium boards to do what is necessary to discover undiagnosed TB, and also states no person shall be compelled to undergo an examination or test for TB if he or she objects on religious grounds unless such person is suspected to be contagious (65 ILCS 5/11—29—8 (West 2002)). Neither of the TB sanitarium statutes, though, applies to DOC, as each statute was specifically designed to apply to those areas that choose to form such sanitariums. The statutes do not prevent DOC from enacting more stringent rules for its inmates. As such, section 7 does not give plaintiff a statutory right to refuse to take the PPD test.

Finally, plaintiff alleges the disciplinary action administered to plaintiff for refusing to take the PPD test violates his first amendment rights, as he refused the test on religious grounds.

Section 3—2—2(1)(a) of the Unified Code of Corrections (730 ILCS 5/3—2—2(1)(a) (West 2002)) authorizes DOC to accept convicted persons for "care, custody, [and] treatment." Under DOC's administrative directive, all inmates "shall receive an annual tuberculosis skin test." DOC Administrative Directive 04.03.101.II.G.2.b(2) (2002). The directive further states as follows:

> "Any offender refusing tuberculin skin testing shall be counseled by the facility medical staff as to the importance of the testing procedure. Any asymptomatic offender who persists in refusing shall be placed in segregation until such time as he or she submits to the testing procedure in accordance with Department Rule 504." DOC Administrative Directive 04.03.101.II.G.2.b(2)(b) (2002).

Disciplinary offenses are defined in appendix A of section 504, Title 20, of the Illinois Administrative Code (20 Ill. Adm. Code § 504 app. A (Conway Greene CD-ROM January 2002)). One disciplinary offense is for failure to submit to medical or forensic tests and includes refusal to submit to annual TB testing. 20 Ill. Adm. Code § 504 app. A (Conway Greene CD-ROM January 2002). Plaintiff, though, was disciplined for disobeying a direct order, which includes "[w]illfully refusing to comply with an order" (20 Ill. Adm. Code § 504 app. A (Conway Greene CD-ROM January 2002)).

Plaintiff claims the disciplinary action impinges upon his first amendment right to freely exercise his religion. At issue is whether an inmate may be disciplined for refusing a direct order to take a PPD test that conflicts with his sincerely held religious beliefs. For purposes of a motion to dismiss, we assume the sincerity of plaintiff's religious beliefs.

■ The United States Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89, 96 L. Ed. 2d 64, 79, 107 S. Ct. 2254, 2261 (1987), stated "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." To determine the reasonable relationship, four factors were outlined as relevant: (1) whether there is a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether there are "alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) the "absence of ready alternatives." *Turner*, 482 U.S. at 89-90, 96 L. Ed. 2d at 79-80, 107 S. Ct. at 2262, quoting *Block v. Rutherford*, 468 U.S. 576, 586, 82 L. Ed. 2d 438, 447, 104 S. Ct. 3227, 3232 (1984).

Defendants claim a legitimate penological interest in detecting latent TB, as it may become contagious at any time. Many courts have examined the issue of TB in prisons and noted how prison populations are particularly vulnerable to TB outbreaks. See *Reynolds v. Goord*, 103 F. Supp. 2d 316, 323 (S.D.N.Y. 2000). Courts have also noted the distinction between active and latent TB and the alternative methods of detecting each kind. See *Hasenmeier-McCarthy v. Rose*, 986 F. Supp. 464, 467 (S.D. Ohio 1998). Unlike active TB, latent TB causes no symptoms and is not contagious, but an individual with latent TB may develop active TB at any time, with the first two years postinfection presenting the greatest risk. *Reynolds*, 103 F. Supp. 2d at 320-21. X-rays and sputum cultures will reveal active TB, but only the PPD test will indicate latent TB. *Reynolds*, 103 F. Supp. 2d at 321-22. If a prisoner is found to have latent TB, that prisoner may be monitored and given prophylactic medication, but this medication has potential side effects and cannot be given to every inmate who refuses to take a PPD test. *Bailey v. Goord*, 174 Misc. 2d 632, 634, 666 N.Y.S.2d 383, 385 (1997).

Based on all of the information concerning the problem of TB in prisons, it is indisputable that detecting latent TB is a legitimate penological interest. Under the first step of the *Turner* analysis, then, the only question is whether DOC's rule of disciplining prisoners who refuse to take a PPD test is rationally connected to that interest.

In previous cases dealing with prisoners who refused PPD tests, courts examined the rational relationship between the penological interest and either the forced administration of the test or the segregation of inmates. A majority of these courts decided that there was a rational relationship. See *Westbrook v. Wilson*, 896 F. Supp. 504, 505 (D. Md. 1995) (holding the regulation of placing inmates on medical segregation passed the *Turner* test); *Ballard v. Woodard*, 641 F. Supp. 432, 437 (W.D.N.C. 1986) (finding the forced administration of the PPD test was necessary to safeguard a legitimate penological interest); *Hasenmeier-McCarthy*, 986 F. Supp. at 468 (holding forcible administration of the PPD test is a reasonable method of accomplishing a legitimate penological interest); *Africa v. Horn*, 998 F. Supp. 557, 560 (E.D. Pa. 1998) (holding the requirement that inmates either take the PPD test or remain in segregated housing for 12 months is constitutional); *Bailey*, 174 Misc. 2d at 635, 666 N.Y.S.2d at 386 (finding the policy of segregating inmates that refuse to submit to a TB test is rationally related to prevent the spread of the disease); *Rossi v. Portuondo*, 277 A.D. 2d 526, 527, 714 N.Y.S.2d 816, 817 (1999) (finding that the policy requiring inmates to submit to the PPD test or face confinement for one year is reasonably related to the legitimate penological interest); but see *Reynolds*, 103 F. Supp. 2d at 340 (holding the inmate would be able to establish that the "TB Hold" program, a program isolating noncompliant inmates in their own cells, is not rationally related to goal of protecting the inmates' health).

Defendants argue the disciplinary action taken in this case is rationally connected to the legitimate penological interest of detecting latent TB. Further, defendants argue the second step in *Turner*, the alternative means available to the inmate, does not apply as Cannon is not requesting that he be allowed to act, but instead that he be allowed to refrain from acting. Under step three, defendants urge accommodating the right to refuse a PPD test would present unacceptable health risks to prisoners and DOC workers. Finally, defendants state that there are no alternatives to the PPD test as only it detects latent TB.

■ We agree that there is a rational relationship between the interest and DOC's coercive sanction of segregating an inmate until that inmate submits to the test. Segregating the inmate would allow DOC to monitor the inmate's health, possibly prevent the spread of TB, and coerce the inmate into taking the PPD test. We also agree that allowing prisoners to refuse a PPD test would present serious risks to the health of the prison population and that there are no alternatives to the PPD test for detecting latent TB.

Unlike the cases above in which the inmates were either forcibly

administered the test or segregated for at least one year until they took the test, in this case, plaintiff was not charged with failure to submit to a medical test, and his punishment was not to be segregated until such a time as he submitted to the test. Plaintiff was punished for violating a direct order to take the PPD test. Should plaintiff agree to take the PPD test during his three months of punishment, it is not clear that the punishment would be discontinued. Further, it is not clear that a PPD test will be administered after plaintiff's three-month punishment has ended. That the punishment was administered to coerce plaintiff into taking the test or to monitor his health is also not clear. Latent TB can become active at any time but is mostly likely to become active in the first year, so the three months' segregation does not appear to reduce the risk of spreading TB.

The issue is whether the punishment for violating the direct order is rationally connected to the interest of detecting latent TB. Because the problem of TB in prisons is so great and potentially dangerous, we recognize that DOC should be given wide latitude in enforcing the mandatory testing procedures. While an inmate does retain his rights to religious freedom, those rights are only retained to the degree " 'that [they] are not inconsistent with *** the legitimate penological objectives of the corrections system.' " *Reynolds*, 103 F. Supp. 2d at 335, quoting *Pell v. Procunier*, 417 U.S. 817, 822, 41 L. Ed. 2d 495, 501, 94 S. Ct. 2800, 2804 (1974). Detecting latent TB is a legitimate penological objective, and DOC may require plaintiff, despite his religious rights, to submit to the PPD testing. While DOC's coercive technique in this case is not in line with its stated policy, the punishment is still rationally related to the legitimate interest of detecting latent TB, as it may encourage plaintiff and others to submit to the PPD test. Thus, despite the fact that the punishment veered from the stated coercive techniques for dealing with a refusal to submit to TB testing, the DOC action in this case does meet the *Turner* standards.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

STEIGMANN and APPLETON, JJ., concur.